The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Thank you, Your Honor, Mr. Call, Mr. Marjolies, Mr. Marjolies, Mr. Marjolies, Mr. Marjolies, The panel. My name is Gary Ticknor, and I reviewed the transcripts and the evidence in this particular case and came up with four issues that were to be raised on appeal. Mr. Marjolies reviewed the transcript and came up with two issues that he will argue separately. Are you arguing for both Mr. Graves and Ms. Jackson? I am not. I am arguing solely for Loxley Johnson. Mr. Marjolies is arguing for Ms. Graves. As I indicated, we looked at the transcript. Neither of us were the trial attorneys, nor was Mr. Call the trial prosecutor in this particular case. I am going to address my issues because of the standard of review and the subsequent impact of them on the following basis. I am going to start with the motion to suppress, then I want to talk briefly about severance and the missing witness, if there is time that it allows. We start with the fact that there was a forcible arrest in this case of Mr. Loxley Johnson, and then there was subsequently a search of his cell phone and then the vehicle in which he was traveling. Those are the two things that we object to. This was not an investigatory detention. It was not based upon reasonable articulable suspicion, but it has to have been based upon probable cause. The government concedes in page 8 of its brief that, in fact, my client was stopped and arrested. Everything in this has looked to a forcible arrest, and I don't believe that that forcible arrest was justified on the basis of probable cause. If there was insufficient probable cause to do a forcible arrest under the circumstances of this case, then the cell phone that was reviewed by the officers immediately following that arrest would not have come within their purview and would not have become evidence in this particular case. Subsequently, of course, the SUV and the $8,000 that was retrieved would not have come into the case either. Now, we are really fact specific in this particular case as to what they knew at the time that they knew it, and it's not really clear from all of the pleadings exactly what happened. You have to sort of put them together, but what you look at is that the officer stopped an individual coming off of a ship, based upon previous information from the security of the ship. That individual tells them that he has drugs. They recover them from him, and that he is to deliver those to Tony, a sex-neutral name, at Walmart, but he doesn't tell them which Walmart. They then choose one that is the closest to the shipping area and for which there is a shuttle. He gives them a phone number for which they can contact Tony, and this phone number has a Virginia exchange. They never, in fact, verify prior to the arrest or at any time in this trial whose number that was. That's the only number that this individual has at that particular time. At some point later on, they tried to call that number. It goes to a voicemail. There was trouble on the phone. The individual, Mr. Excel, was having trouble with his phone that particular day, and a number comes up on his phone. We don't know the source of that number, and then there are some subsequent calls to that number. The SUV is spotted in the Walmart that is nearby where the ship was docked, and the officers go there, and they look at this SUV, and they focus on this SUV because it has a Virginia plate. That wasn't all, though, was it? No, Your Honor. The vehicle was moved from one parking space to another. But that was later on. The problem that you have is ... That was before they arrested Mr. ... It was. It was, and it was following the acts of the officers also. The car was moved from place to place. It was moved a couple of times, but at the same time, there were people in that parking lot who were watching the car. The car was moved, in each instance, closer to the Walmart. I don't know what the people were thinking who moved the car, but if we're just looking at it from the outside, and somebody's looking at my car hard, and I don't know what they're going to do, I might move it a little closer to where I am. I don't know if that's the only reason, but that's ... The record didn't show that they knew they were being watched, and the record only showed that they were attracted to the vehicle because it kept moving, and the people were going to Walmart, and they weren't coming out with any bags like they were shopping. With all due respect, they said that they became attracted to the car because it had Virginia plates, and that it is quite some time later that it's actually moved for the first time. It's more than an hour and a half after they start their observations that that car is moved for the first time, and then parked somewhere else. They start their observations at roughly 10 o'clock in the morning, and it is not till 11 something that the car is moved, with all due respect. Then they see an individual who was unidentified at that point enter the vehicle, talk to the people that are there, and leave that vehicle. They don't stop that individual. They do know that he's from the ship. He has a ship's jacket on. They don't stop the individual. He has never stopped. He's never questioned, and he's never arrested. They don't know why he got in the vehicle or why he left. Was that Mr. XL? No, that was Mr. Graves, or Mr. Garth, I'm sorry. Mr. Garth was not identified until considerably later, so they had no idea of who Mr. Garth was at that particular time. That individual leaves simultaneously, or shortly thereafter, and something that doesn't come up until later, is that a Mr. Neptune enters another vehicle, not my client's car. He enters a vehicle that has Special Agent Hyman sitting in it, and he looks at him and says, are you Tony? And Special Agent Hyman actually pulls out his service revolver at some point and forces the person out of the car. So the mere fact that one of the individuals that was a potential co-conspirator in this case got into a car with my client is not determinative, and that information was . . . I've heard everything you're telling us right now, right? Yes, I'm sorry. The jury heard all of the evidence that you're talking about in this chain of events here. The jury heard all that. Yes, but I am at this point addressing whether or not there's a search and seizure issue. So just go to that, if you would. I'm trying to find your point. Well my point is that there's just insufficient factual evidence by which you can find probable cause in this particular case. The officers did not have anything that said, there's drugs in this car. They found no drugs in the car at the time of the stop. They had found no drugs from anybody other than from Mr. Excel prior to entering or to stopping that car. They did not have, at the time that they stopped the car, who the car belonged to. They did not have, at the time that they stopped the car, who the cell phone belonged to that Mr. Excel had called when the one and only phone number he got from his contact outside of the country went to voicemail. So we don't have anything concrete, and that's the point I'm trying to get to. I'm sorry if I was belaboring it. You are arguing the motion to suppress, basically. Yeah, well I am sort of arguing motion to suppress under those circumstances because I think it's factual. I think this one is really factual in this particular case. And it's- Wasn't the vehicle moved consistent with the unknown person saying, wait, Walmart is hot, I'm going to another location, and then that vehicle then left and then went to the service station they followed, isn't that correct? If you look at the facts, what happened is that there is a phone call, and in fact they say it's hot, and I'm leaving. But he doesn't leave. He drives the vehicle to another location in the parking lot, and he stops, and he waits there for some period of time, considerable period of time, and it is then, and only then, that he leaves. Now, you know, the fact that there's a delay in that seems to indicate that they may not have had as clear a cause as they make it out in the brief, Your Honors. The difficulty that you have is that virtually everything that is encountered by these officers can be explained away in an innocent manner. This is a parking lot in a place where ships- So that's not the standard for determining probable cause, whether or not it can be explained away as innocent conduct. That's true, Your Honor. But, you know, what this court has said when we were talking in the terms of reasonable articulable suspicion is that, you know, innocent acts brought together, and let's see, an intrusion with reasonable articulable suspicion is a lesser intrusion than an arrest. So it would seem to me that probable cause would require more or stronger evidence in order to simply stop them. And this court has, in a number of cases, said that you can't just put together a whole bunch of innocent facts and say, okay, that's a reasonable articulable suspicion. Well, what I'm doing is I'm going off of that and saying that you can't do that in probable cause in this particular case. You have no smoking gun in this particular case that allows them to take these innocent facts or facts that could have been considered innocent in any way, shape, or form. They don't call and don't bring to the court's attention certain facts that I think are very important, at least at that initial point, but then they find them out later. And that situation I think also goes to whether or not the motion should have been denied. If you look at the memorandum that the court files, the court draws upon all kinds of sources other than the testimony in the hearing itself, but does not draw upon certain other facts that came about. For example, that Mr. Excel couldn't even tell you which country he got the drugs from initially. He initially says that he made contact in Dominica, and it is only after the government changes that by a question, a direct question, it says, now, when you were in the Dominican Republic, Dominica and the Dominican Republic are two vastly different countries. One's in the Lesser Antilles, the other one's in the island of Hispaniola. He couldn't tell you what city he got the drugs in or any of that sort of thing. But there is no question he got some drugs. The question is where they came from. He would not or could not give them the name, where the Walmart was located, and he could telephone contact with this person, Tony. So they don't know the sex of the individual. They don't know whose car he's driving in, what cell phone he has, what's going on under these circumstances. Yes, there is some suspicion that comes about from what they have put together, but again, they have amalgamated a bunch of innocent facts and have tried to make it into probable cause. I don't think it gets there. As to the severance in this case, I didn't try the case. I think I would have raised a motion for severance once the district court ruled certain evidence was inadmissible against my client, and then because co-counsel wished to have it in for his client, allowed the evidence to come in. And that evidence was from part of the cell phone search. When they searched the cell phone, some of the materials in that cell phone were not searched until the day before trial. They just looked at it briefly at the time, and then they held on to it. And so it was only a day before trial that they received that information. It was suppressed by the court. It could have been suppressed for one of either two reasons. One, because it was a discovery violation, but it could also have been suppressed because of a kind of general search type of analogy, that is, that you have seized something that you didn't need to seize in terms of evidentiary value. You did not look at it until well after the fact. That's sort of stretching it, but that would bring it up to a constitutional situation. The problem that you have is that trial counsel did not at that point ask for a severance or for a motion to dismiss or a motion for new trial. I think that the district court should have, when making that decision, that I'm going to allow in evidence that is damning against Mr. Johnson, but beneficial to the co-defendant. And this is evidence that I previously suppressed, and we've already had opening statement. We're starting into the trial. We're into the trial. At that point, I think, sua sponte, the court has a responsibility to say, I'm going to let this evidence in, but I'm going to sever these individuals. It's not a prudent problem, is it? It is not a prudent problem. I agree it is not a prudent problem, but it seems to me that if you look at the case law, they talk about fundamental fairness. And it seems to me that when you've told somebody you're not going to allow that evidence in by the government under any circumstances, and then it's brought in by the co-defendant who did not say a word during that motion, sandbagged you and then nailed you later on, and got a benefit. Let me ask you this. Ms. Graves made a pretrial motion for a severance, did she not? She did. And that was denied. That was denied. Mr. Johnson never moved to join that motion. No, Your Honor. In fact, he has never made a motion for a severance. No, Your Honor. I agree. I didn't try that case. There was no adoption by the trial counsel. I will say that having done a Rule 8 motion for a severance, Rule 14 comes into play thereafter. And there is a general rule in the district court that the motion of one is the motion of all. So by and large, you can rely upon that. I'm not sure, you know, that's what we rely upon on the district court. I'm not sure that the circuit court necessarily does the same. As to the missing witness situation, and I show that I've got, I've... It's a little lenient because it's a complex case and... Go ahead. All right. Thank you. Go ahead. As to the missing witness situation, there was Mr. Garth, who's allegedly the person who gets into the car with Mr. Locksley and, or Mr. Johnson and Ms. Graves, takes drugs out of his shoes and off of his belt and puts them into her handbag. He's not called by the government as a witness. And not subpoenaed by the defense, not called. As far as I know, he was not subpoenaed by the defense. My understanding, and again, I'm just looking at the record, I wasn't there, was that they believed he had been deported or was gone. It's... It's in the record that the government did anything to prevent Mr. Garth from being available? No. There's... I have nothing of that kind. The question is, if they have made a cooperation agreement with him, they can call him to testify, but if the defense calls him to testify, he has a Fifth Amendment right. Would he have raised the Fifth Amendment right, or would the government have asked him to raise the Fifth Amendment right? Probably. So, you know, the question is, is he available to the defense, even if we subpoena him? And I... Did the defense know where he was? I don't believe so. Again, this is a relatively small amount of the transcript, and it comes around when they're dealing with the jury instructions, and I think just before the end of the case, the defense indicated that it wanted to call him, and then there's a question in the jury instruction. If they wanted him, couldn't they have filed a writ for habeas corpus? Not if he'd been deported out of this country. And he was a foreign national. He wasn't deported outside of the country. Right. That's... If they had filed for the writ, they would have found that out, if he was. But according to what I read in the transcript, he was in the custody of the United States Marshals awaiting sentencing. Well, that's what we have... I have discovered based upon the subsequent filing by the government. I didn't know that at the time we wrote the brief, and I didn't know that from the transcript that we had. And it's unclear what the defense counsel may or may not have been aware of, but the question is whether, if he had been subpoenaed by the defense, he would have been a witness that they could have called, because he had a Fifth Amendment privilege remaining. He doesn't have a Fifth Amendment privilege remaining against the government, because they made a cooperation agreement with him, and he's not going to be prosecuted for any of those things that would be the subject matter of the testimony. And the problem... The question I have, and it's... To me, it's a fundamental problem here, is that the government interviews six people. Two of them say what they want to hear. They take those two people and they put them on the stand, and four of them contradict those two, or do not verify in exact detail what those two said. They are unavailable to the defense, because we can't call them because they're going to raise their Fifth Amendment, because they're going to get their 5K. What do we do? Why is that fair? And if you have somebody that allegedly is cooperating with you and turned over the drugs, why in God's name wouldn't you call him? That, to me, is very fundamental. I mean, if they didn't call him, and we don't know why they didn't call him, they didn't say in their brief, they haven't said to the state. And we... There's no way we can get that. We can't even get that to show a Brady violation if one exists. Guy's gone. I have a real problem that no missing witness instruction was given under those circumstances. And it may be because I do primarily trial work. I do appellate work from time to time, as the court may know. But I think that that is something that is really fundamental. When they have witnesses, they should at least have to tell the court in chambers by a filing of some kind to show why they're not calling a witness that is available to them that is cooperating with them. Was there a witness list given before trial? There was a list of individuals, I assume, given before trial. I don't have that list, and it's not in the file that I received. So the name you're complaining about, Mr. Garth, I think, was not on that list. I don't know. Normally speaking, you don't get a list of witnesses from the government before trial. What you get is a list of people whose names may be mentioned. And that is solely for the void of purpose, if the court is aware that the government has no obligation under Rule 16 or otherwise to give us the names of the witnesses they're going to call. They simply have to give us a list of individuals whose names may be mentioned so that the voir dire can be done appropriately. So I don't know if they—I don't know when the defense became unaware—or became aware that they were not going to call that individual. That's as close as I can make it, Your Honor. I'm— All right, Your Honor. I had reserved some time for rebuttal. I would still like to have a little bit of rebuttal, depending upon what the government argues. Thank you very much. I would like to have the case sent back for a new trial in this matter.  Mr. Margulis. Thank you, Your Honor. May it please the Court, Counsel. My name is Howard Margulis. I represent the appellant, Shanika Graves. Your Honor, I contend that Ms. Graves was in custody when she was interrogated and admitted to the police that there were drugs in her purse. And that was the sole substance of the statement that was used against her at trial, the statement and the drugs which were admitted into evidence. Notwithstanding the police officer's statements to my clients, the statements that she wasn't under arrest, she could stop the conversation, and other statements of a similar nature, which the Court found sufficient to find that she was not in custody. I think it's important for this Court to look at the police officer's conduct, because the conduct in this case nullified the officer's words. But up to a point, this case is not unusual. Talking to an individual in a police car, we have a number of cases like that. And there have not been many reversals. But there is a unique circumstance in this case. To a point, Your Honors, they asked to look at her Walmart bags. Nothing unusual about that. They wanted for officer safety to look at her bags. They asked to look at her purse. Nothing unusual there. When they put her in the car, they hold on to the Walmart bags, they hold on to the purse, they hold on to her identification. That begins to be a problem. But in and of itself, the issue of whether or not they are creating a police-dominated situation, I'm not going to stand here and say that we have achieved that level. What happens in this case, and what the Court did not necessarily, did not confront, is that Agent Ferris, who essentially was the lead agent, said that at some point, she said, I have stuff, there are drugs in my shoes. And she began to cry, and he waited until she finished crying. And then he Mirandized her, and then there were a series of telephone calls. And that's essentially what the Court accepted. But there were two other officers, another agent, and Agent Freeman, and a detective, a Detective Copeland. And they had the version of events different. And that's where I say this case is an important case for a custody determination. Because Freeman said that she was crying before, the telephone calls occurred before she was crying, which means that they had to occur before the Miranda. But more importantly, Copeland is the one who nails it on the head. He says that the phone calls came in, the phone calls were about stuff. They were drug-related phone calls, where's my stuff? Where's my stuff? There were, in fact, two phone calls. And at the conclusion of those phone calls, either one or two, Agent Ferris demanded of Ms. Graves, what stuff is he talking about? No Miranda has been given at this point, according to Agent Detective Copeland. And at that point, she caves in. And that's what makes this case different than the normal car case, where the police are interviewing a witness. You've got three officers in a car, and I would say that is the beginning of a dominated situation. But it's the coercive situation that they're creating, making her participate. And Freedman and Copeland say that they're instructing her about the phone calls, they're telling her to answer the phone, they're giving her, they call it suggestions. They're making her participate in dangerous, drug-related, drug dealer phone calls. And Your Honor, I think not only did it call for Miranda earlier before any participation in those dangerous phone calls, but it also, as I said, offends due process. Because if you don't get a lawyer involved, even if they didn't read her Miranda, they should have, in some way, had safety protocols before involving her in that type of activity. And so I think it offends both Miranda and due process, Your Honor. Thank you very much. If you have any questions, I'll be happy to answer them. I do want to reserve a little bit of time for rebuttal. Thank you, Counsel. Thank you, Your Honor. Call. May it please the court, I'm Josh Call for the government. Beginning with the probable cause issue, I think a significant fact is that this case began after the tip that there were going to be drugs imported on a cruise ship. With the detention of Mr. Excel, the seizure from him of several hundred grams of heroin and of cocaine, and his statement to officers that two other individuals were also working with him as couriers to import drugs, and that he was supposed to deliver those drugs to a person named Tony at a nearby Walmart. That's significant because there's no question in this case, and there's no reasonable doubt, I think, in the officer's mind, that there was a drug conspiracy, and a conspiracy to import drugs going on as soon as they had seized those drugs from Mr. Excel and questioned him. So at that point, this isn't- Let me ask you this, excuse me. How did they focus on Mr. Excel? As soon as he got off the ship, they focused on him and arrested him. My understanding, Your Honor, is that the officers stopped, got pictures of certain individuals. They received a tip, and there's not much information in the record as to how they got that tip or who provided it, but that when the individuals came off of the ship, Mr. Excel was one of the individuals who they had stopped. I think they were looking for the others as well, but using their- But they had reason to stop him based on what they'd been told by either the security officer on the ship or somebody on the ship. That's my understanding, Your Honor. And they also had border authority at that point to conduct the search of Mr. Excel. But that's a fundamental difference between this case, the fact that there was an initial seizure, and cases involving perhaps innocent observations that could be taken to indicate that there may be criminal activity afoot. Here, there's no doubt that there's criminal activity afoot when the officers go to Walmart to investigate to see if they can find Tony. Now, they receive not one, but according to the testimony at the motions hearing from the officers for Tony, one of those numbers is registered to LaToya Johnson, according to a database check that was conducted prior to the arrest of Loxley Johnson. Now, when officers go to the Walmart parking lot, there's one car in the lot that they see from Virginia, and again, Virginia is significant because the two numbers for Tony both had 757 area codes, which is the Norfolk, Virginia exchange. They see one vehicle with a Virginia license plate, and that vehicle is registered to the very same person, LaToya Johnson. So now we have the seizure of drugs, and we have that connection between one of the numbers for Tony and the car that the officers are surveilling. That alone is very significant evidence that the occupants of the vehicle, the GMC envoy, are engaged in criminal activity here. Then on top of that, you have some of the things that Judge Hamilton mentioned before, for example, you have the vehicle being moved from one parking spot to another. You have two individuals who are going into and out of Walmart multiple times with no clear purpose. There are no shopping bags or anything of that sort. Then you have a person who apparently is from a ship, it turns out later that they learned this is Mr. Garth, who enters the vehicle, first speaks to the driver, then enters the rear of the vehicle, and then bends over and appears, according to one of the officer's testimonies, to be messing with his shoes. Which is significant here because there were shoe inserts in Gavin Excel's, in his shoes, where the drugs were seized. So it's reasonable to believe here that this individual may have been retrieving drugs from his shoes. That individual then, soon after entering this GMC envoy, leaves the vehicle and returns. First he goes into the Walmart, and then he returns on a bus going to the ship. Then on top of that, you have Neptune show up. He appears to be conducting counter surveillance. And then he's seen standing near both Ms. Graves and Mr. Johnson in Walmart in front of the building. And then as Judge Gregory mentioned before, there's the coincidence in time between the call, the controlled call to Tony, in which Tony says it's hot here at Walmart. Which is significant, by the way, given the prior counter surveillance and the proximity between Neptune, Graves, and Johnson. So he says it's hot here, I'm going to look for somewhere else. And then within a matter of, I think, ten or 15 minutes, he leaves the parking lot. This is Mr. Johnson, leaves the parking lot in the envoy, and then goes to a gas station where he sits for about ten minutes, doesn't do anything. Doesn't get gas, doesn't go into the mini mart, and is seen as he's leaving with a call to his ear right as a phone call comes in to Gavin Excel, the individual who was in contact with Tony. So taking all of that together, there was abundant reason here to believe that the occupants of the envoy, including in particular Mr. Johnson, were involved in criminal activity, and to conduct the stop of the vehicle and to arrest Mr. Johnson at that scene. Turning, your honors, to the argument that Mr. Tickner made with respect to severance. First, this is an argument that has to be reviewed under a plain error standard. As Mr. Tickner acknowledges, the issue wasn't raised below. And I should note as an aside point, there's no case law for the authority that if one defendant argues for severance, that all defendants have raised the argument for severance. And in fact, the case law is to the contrary. The Brooks case which we cited, in that case, not only had a co-defendant move for severance, but the defendant himself, who was arguing for severance, had moved for severance as to, I think, one co-defendant, but not the one with whom he was arguing severance was appropriate. And there, a plain error was found to apply. So here, your honor, first of all, it's not clear that there's error, much less plain error, in not severing the case. As Judge Gregory pointed out, this is not a brutal situation. It's a situation in which there was evidence that was provided to the defense late and that was not going to be permitted to be introduced for that reason by the government. And it wasn't, it was introduced by a co-defendant. But it's not clear how the introduction of that evidence affects a specific trial right of Mr. Johnson here. Indeed, had the case been severed, presumably there would have been a new trial for him later, and at that point he would have had that same evidence for some significant period of time. And that evidence presumably would have been admissible at that point against him. So it's not even clear that he's been prejudiced by the lack of a severance here. Certainly, there was no impact on his substantial rights, and there was no miscarriage of justice, because the evidence against him was very strong. And on top of that, the evidence as to the fact that the phone seized from him was the same number that Excel had been calling, was largely cumulative of the evidence that was recovered from his phone immediately at the time of his arrest. Which is that, his phone had received a call from Gavin Excel. The number was listed in the phone as SHP-GAVN, which officers understood to refer to as Ship Gavin. So there was already clear evidence that Johnson and Excel had been in contact. So the fact that the number was in fact the one that Excel thought he was contacting corroborated that, but it was not important evidence such that this was likely to have any impact on the outcome of the trial, certainly not such that it affected Mr. Johnson's substantial rights. With respect to the missing witness instruction, Your Honor, the law is clear that for this instruction to be given, a party has to be peculiarly within the control of one party. As Judge Hamilton pointed out, Mr. Garth was in the US Marshal's custody. At the time of the events at issue here. So physically, he was clearly within the reach of the defense in this case. With respect to Mr. Tickner's Fifth Amendment arguments, those are points that have to have been presented at trial, we think, for them. Whatever merit they have, if they had been pursued, they weren't. We don't know whether Mr. Garth would have invoked his Fifth Amendment right. It's unclear what would have happened. And what he's seeking to do here is both have the benefit of not risking adverse testimony of Mr. Garth at trial by attempting to call him, and yet here seeking the missing witness instruction. It potentially would be a different case, I don't know, if he had actually sought his testimony, and then he had invoked his rights under the Fifth Amendment. But that's not the case we have here. As a side note, the case law is consistent with the position that no instruction should have been given. Rukaj, an unpublished decision from this circuit, involved similar set of facts in that it was an individual who was cooperating with the government, and there the court held that no missing witness instruction was necessary, similarly in Spinoza, First Amendment case. In that case, an individual was actually a paid government informant. And even there, the court found that no missing witness instruction was necessary. Given that case law, there's no reason that one should have been given here either. So turning then finally to the issue raised by Mr. Margulies as to whether Ms. Graves was in custody. I think it's important to begin with the fact that we're here reviewing a motion to suppress that was denied. So the facts need to be taken in a light most favorable to the government. That is important here because Mr. Margulies is absolutely correct that there was inconsistent testimony given by the officers as to precisely the order in which the events here unfolded. Agent Ferez's testimony, as Mr. Margulies said, is clear that she first admitted that she had stuff, she said, in her purse. Then it was seized. Then she began crying. After Ms. Graves had sort of composed herself, according to Agent Ferez's testimony, calls came in. And in fact, they had been coming in sort of continuously is what he said. He then said, they asked her essentially, are you okay to answer these calls? After she had asked whether she should answer them, and she said that she was. So under his version, the calls and anything relating to the calls is post seizure of the drugs here, post admission. And taking the facts in a light most favorable to the government here, as the standard requires here, that testimony has to be credited. And that rather than Agent Freeman's testimony is significant. I would also note that putting the standard aside, if one looks at the testimony of Agent Ferez in the whole, his testimony is clear, it's precise, it's logical, it falls from each other. Agent Freeman, by comparison, was actually not called by the government. He was called as a defense witness. His testimony throughout says, I can't remember precisely what happened. I don't recall the details. In the government's argument in that case, which is in the record, in the suppression argument, the prosecutor at the time suggested that the court actually just disregard Agent Freeman's testimony. And Judge Quarles, the prosecutor pointed out that he didn't seem to read the reports much, and Judge Quarles sort of offhandedly said he didn't seem to read the reports either. So Judge Quarles was clearly not taking his testimony as particularly helpful. With respect to the Copeland distinction, I would just direct, I guess, the court's attention to the relevant pages in the joint appendix, essentially 128 through 132. I think that Mr. Margulies' interpretation, the inference that he's drawing as to what Copeland's testimony said, is probably the best inference to draw. But it's not nearly so clear in the testimony from Mr. Copeland that first the calls came in, then she answered them, and then she was immediately thereafter asked, what were you talking about in the calls, and that's how the agents discovered it. For example, at page 131, there's a reference in lines 9 through 14 to, did the agents question her about the phone calls? And one of the questions was, what stuff are they talking about? What's the stuff? Now, moving ahead to 132, at lines 9 and 10, there is an answer. I remember she said the stuff. It says it's in my purse. But between that, there's this discussion in which, for example, line 25 on page 131, the cross examiner says, now am I correct that while she was in the car, before she was given any warning of rights, that her pocketbook or her handbag were searched, and what you maintain were cocaine and heroin were taken out of the handbag, and then the discussion proceeds. And then he says, I remember she said the stuff. So it's not clear that one falls from the other. That said, I think that's probably the best inference to draw. I mention all that only because of this. Again, the standard indicates that Agent Perez's testimony is what controls here, because we have to take the facts in the light most favorable to the government. But it's not just the standard that suggests that that's the right reading. It's also that it's not exactly clear what Copeland was saying. And even if we were to draw the inference, which Mr. Margulies has drawn here, it still has to be balanced against Agent Perez, who was very clear. So there's a lot of reason to think this questioning happened after. More broadly, regardless of whether the questioning happened, this is clearly not a custody situation. It's one in which the agents approached Ms. Graves. They asked her to speak with them. She agreed to. They didn't touch her. They didn't order her. In fact, they told her she was specifically not under arrest, that she did not have to answer questions and could stop it. So it's pretty far on one extreme away from being a custodial situation. Now, when they bring her in the car, whatever happens with the timing on the phone calls, Ms. Graves is also, it's clear she's not directed, but either asked if she wants to answer the calls, or to answer the calls, or in Agent Perez's recollection, she actually asks if she should answer the calls, and is requested to do so. So regardless of what the timing is on the calls, there's no compulsion. And as we point out in the brief, even if there had been some sort of compulsion with the phone calls, it still wouldn't rise to a level approximating custodial arrest. So for multiple different reasons, this is not a custody situation. And her statement was not one in which there was any lack of voluntariness, or that took place in a situation in which she was in custody. So if the court has no further questions, the government will rest on its briefs, and request that the court affirm the convictions. All right, thank you, Mr. Call. Mr. Tegman? Yes, I'd point out that Mr. Call did not try the case either. And if he had, he might have noted on page 373 of the joint appendix, where Mr. Excel is testifying about how he called the second number. The testimony on cross-examination is instead of calling the number, the number you had for Tony, right? You called this other number. Yes, sir. Why? Why wouldn't you call Tony's number if you wanted to reach Tony? And he said, because this was the last number. I said, okay, let's try it. I'll call it. That's how that contact was made, to the cell phone. And I think that's fairly significant under the facts of this particular case, because what the government didn't do until the day before trial was ascertain that the cell phone that was recovered from Loxley Johnson, or in his general vicinity, was in fact the cell phone that was called. So the fact that this person was calling 7575762843 was the fact that was suppressed by the district court. They were not going to be able to say he had that cell phone that day until, and you'll find on page 335 of the joint appendix, until the question is asked by Ms. Graves' attorney over strong objection of Mr. Johnson. Do you know who was carrying the cell phone that day with the number 7575762843? Objection by the defense. Court overruled. Witness, yes I do. And who was that? Loxley Johnson. So the connection between Mr. Johnson and that cell phone, the connection between him and Mr. Excel, was solely supplied by the co-defendant's question and bringing into evidence evidence that had previously been suppressed. How is that a violation? It's not a brutal violation. It is not a brutal violation. And the mere fact that defendants have conflicting, or it's not a violation either. Well, your honor, I think that once you've suppressed that information, and that- Suppressed insofar as the government was concerned. The government's not the one that introduced that. Yes, your honor, and I agree. But once you decide that you're going to let the co-defendant introduce that information, a co-defendant that did not say word one when the motion was being held, which I would expect counsel to stand up if they wanted to introduce that and say, excuse me, but I want to introduce that. And then we could have sorted this out before it got to be trialed. All right. What evidence is there in the record that the court even knew that Ms. Johnson's attorney was going to ask that question? There's nothing in the record until Ms. Graves' attorney goes into that area, and that's when the judge changed his mind and reversed his decision. Ms. Graves' attorney- Reversed his decision. His decision was that the government couldn't introduce that evidence. Right. And the government didn't introduce it. Ms. Graves' attorney introduced it. Technically, yes. Okay, thank you. But I think that at that point, the impact is the same whether it's being introduced by Ms. Graves or whether it's being introduced by the government. Ms. Graves benefited quite a bit from that, or from what happened in this overall. She got a year and a day as a sentence, and my client got 20 years. So I think she's not out much. Your Honor, you asked me what was the point that I was making on that search and seizure. And I'm sorry, I didn't really answer you correctly. To me, one of the points on the search and seizure is the fact that after the arrest of Mr. Johnson, the police then call for a canine sniff of the vehicle. The dog comes and gives a negative sniff. Now, they say that the handler said, there were too many things in the car for him to give an adequate search or a full search. Food particles. Food particles and so forth. And I had submitted a supplemental authority in terms of Florida versus Harris, which basically stands for the proposition that when you have a dog such as that, he's reliable unless there are extraordinary circumstances. And he's reliable based upon the tests that occur outside of the field test. And presumably in those field tests, or in those tests for certification, they have food particles and things spread around to try and trick the dog. So it seems to me that the officers at that point had a negative canine sniff. Now, they not only have to have probable cause for the arrest of my client. They have to have probable cause to believe that contraband is included in that vehicle. My client's outside of the vehicle, he's on the ground, he's prone, he's handcuffed. It is not an Arizona, well, it is an Arizona versus Gantt kind of situation. They can no longer search the vehicle as a search incident to that arrest. So now they have to have probable cause to go into that vehicle. And they've just done a canine sniff that says there's no contraband in that vehicle. If the defense has to rely upon the accuracy of that canine sniff, it seems to me that the government has to rely upon the accuracy of that canine sniff. They can't pick and choose which ones they want to pursue. They can't say, well, we've got probable cause, forget the dog. It seems to me that at that particular point, they should not have gone into that vehicle. The $8,000 would not have been introduced against my client. I think that there were an amalgamation of things that made this case much worse for Mr. Locksley Johnson than it should have been under the law. And I think that his conviction is wrong. For lack of a legal term, I would simply say it's wrong. We're in a circumstance where he has suffered Grayville, 20 years imprisonment, and there were some difficulties in the search. There were some difficulties in the arrest, and there were some difficulties in the trial. Thank you very much. Thank you, Mr. Tignan. Mr. Margulies. Excuse me. Mr. Margulies. I just wanted to point out, counsel for the government compared the testimony of Agent Ferris and the agent is at Joint Appendix 153, and I guess it's in the eye of the beholder, and I understand the standard. But when you read his testimony, he uses words like, eventually, she told us, there are no real time markers. But when we look at Detective Copeland at JA 132, he's specific. He says, Agent Freeman got the two shoe inserts out in the belly pack. And then Miranda, she was Mirandized, and it's very specific. It doesn't mean that these police officers at time throughout their testimony do not express some ambiguities. But as far as time markers, Detective Copeland is specific, and it has the ring of not only truth, but specificity, your honors. Thank you very much. Thank you. Mr. Tignan, Mr. Margulies, I note that you're both court appointed. I want to particularly thank you both for taking the representation. We couldn't do our work in the court without your splendid work in cases like this, and we really appreciate it. And Mr. Call, thank you for ably representing the United States. We're going to ask the clerk to adjourn the court for the day, and we'll come back and agree counsel. This honorable court stands adjourned until tomorrow.
judges: Roger L. Gregory, Stephanie D. Thacker, Clyde H. Hamilton